Mr. Collins, Chase, we're here to talk about toys, right? We are, Your Honor. It should hopefully be a fun discussion. May it please the Court. The District Court erred in this case by invalidating the five patents ensued under Section 101 under Rule 12b6, Motion to Dismiss. The Court incorrectly concluded that What claims did you specifically argue below? I mean, we're not going to analyze 242 claims separately. What are your representative claims? Well, Your Honor, that's actually an issue because Hasbro had attempted to identify one representative claim. We identified a number in the complaint and some additional ones in the 12b6 opposition brief, and I would be happy to identify which ones those are. But I think the bigger issue is that the District Court didn't even look at the claims that we had identified. It instead, and I'm looking at Appendix Page 4 here, it attempted to identify the core concept that underlied all five of these patents. They do have different claims of different scope, and indeed, they come from four different specifications. So we believe that here it was too much of a reduction to reduce all five patents to a single core concept. You're not alleging there's any question of fact that would preclude a decision on a motion to dismiss, are you? We are, Your Honor. I believe What's your question of fact? Your Honor, if we look in the complaint, and this is at Appendix Page 1004, 1003, 1004, the allegation in the complaint was that the patents in suit that ordered a combination of components provided an inventive concept by improving the functioning of devices like toys, and that's Paragraph 16 at the top of Page 1004 of the appendix. Paragraph 17 goes on to state that the technologies claimed presented new and unique advantages over the state of the art at the time, which was 1998, and that at the time of the invention, the technologies were innovative. I think this presents a fairly similar circumstance to some of the Court's recent opinions, which postdate the briefing in this case, in a case like Atrix, where the complaint, here the original complaint as opposed to an amended complaint, but the complaint presents an argument that the technology was not conventional at the time of invention, and that should have been interpreted in the light most favorable to Dioware at the 12B6 stage of the case. When you say the technology is not conventional, you're not talking about the specific components, though, are you? No, I'm not, Your Honor. You agree that all the components, and I have a bunch of different claims sitting in front of me, but the one at least I'd like you to talk about, because I think it's the most difficult one for me, is claim one of the 963, the toy kit, as opposed to all the method claims. How do you distinguish that claim from TLI, our decision in TLI? And I'm going to ask this question of your friend on the other side, and compare it to our decision in Thales, because it seems to me that those two cases look at very similar things and come to, I won't say inconsistent, but certainly different conclusions based upon what they're looking at in terms of what the abstract idea is and how it's implemented. Certainly, Your Honor. So to answer your question regarding TLI first, I think actually the claims here, claim one, really does show how this case is different from Thales, sorry, from TLI. In TLI, the court, as you know, held that the patent was ineligible in part because it relied on purely generic components, a purely generic technological environment, and that was a server that did just what servers always do, a telephone that did just what telephones always do. In fact, the telephone was simply a source of digital images. I think the telephone could just as easily have been a digital camera. What we have here are combinations of components that actually lead to a new component, which is the new toy, a toy that, for example, a goose that you wind up and it walks around on the table is a different toy from a toy that can hear that goose and move to follow it based on detecting the position. Can I just get some clarification on that point? I don't want to interrupt the judge. But as I understand it, your argument is that this is a technological improvement because it applies communication in the field of toys. So it's not taking the technology out in the step two analysis.  It's just this technology has not previously been applied and used with respect to toys, right? I think that's pretty much correct, Your Honor. Isn't that not Mayo or CLS? My understanding of step two in Mayo and CLS is you're not looking – I mean, applying it to the new concept, applying a computer arbitration, you could have made the same thing. But it seems to me the Supreme Court's analysis rested on the additional thing that you were bringing in, the additional technology, not on the fact that applying that technology to toys or arbitration would be somehow different and unique and not done before. Do you understand what I'm saying? And do you agree that that's what the case law calls out? I think I agree with you on both of those points, Your Honor. Where I would disagree would be the framing of that as using existing technology and just simply applying it in a new way. What the allegation is and our argument is that by applying that technology, it actually requires particular applications that lead to a new improved toy and that reflects a practical application. And one of the key differences between this case and – So are you arguing this is eligible at step one as well as step two? We are, Your Honor. We certainly are. It has become a little more difficult to determine whether an improvement in the field, whether it be computers or toys, is a step one or a step two inquiry. But we're arguing that as in, for example, Thales or in Deere, to go back to your question about Thales, that this would be step one. I should know this, but I didn't reread it this morning. Is Thales a step one or a step two case? I believe it was a step one case, Your Honor.  Okay. So let me get you back to this toy kit claim and TLI. Why isn't this the same thing? This is just – or let me ask you the other question. Your logic about this is doing all this with these toys creates a new toy. Why didn't implementing the organization and coding software in TLI create a new camera? I think that it goes back to the court's guidance in Alice regarding the ubiquity of general purpose computers. We certainly have elements here that are computer-type elements. Sure, but TLI wasn't just a computer. It was a camera with a microprocessor or something very, very similar. What's the difference between a camera with a microprocessor and a toy with a microprocessor? I think the difference is that the camera with the microprocessor was itself a conventional item. Here the toy is not a conventional toy as was the state-of-the-art in 1998. The microphone was conventional. The actuator was conventional. But when you combine those components together, you get a non-conventional toy. And that's the environment in which this alleged method of communication – What's not conventional about a toy with a microphone and a microprocessor? The allegation and the complaint are? The addition of the microprocessor that can do this software? Well, in part. I don't want to belabor this, but this is my problem. It sounds a lot like TLI to me because I think at the time of the TLI patent, people weren't necessarily putting microprocessors in camera to do the encoding and the like. But the court still looked at the fact that it was basically just using a computer to implement an abstract idea. That's correct, and I think that that is part of the difference, John. I think there's a greater concern in cases under 101 where we're using generic computer functionality, and that's not what the toy has. It doesn't? I mean, where does it say in the claim that it's anything other than – I mean, you don't even describe what it is, but I assume an analyzer or the actuator are just some kind of microprocessor. Well, the actuator is actually something that causes the physical response. So it's the interface between detecting some property of another toy's motion and then causing the second toy to move to follow that first toy. So that is a good example, actually, of something that is not a generic computer component. I think, for example, in TLI, if you had had a classification system where the – for example, you classify information about where a photo was taken, and then the computer moved on wheels to move itself to the location based on that classification, I think that would have been a very different case. It would have been something that was very different from generic computer implementation. And so that's, I think, what we have here. We have these toys performing specific physical behaviors in response to any analysis of the acoustic signal. So it's not that they have the signal in the claim. Just like in many of the past cases, the signal in the claim does not defeat its eligibility. It's the fact that it applies it to create these new toys that are more fun to play with because they have these physical behaviors. And that's not generic computer functionality. At least for claim one. Yeah, and I think some of the dependent claims – If we look at some of the method claims, they seem to be at a much higher level of abstraction. I think you start to run into problems with those. Well, you know, I would agree with you, Your Honor. I mean, I'm just looking down at the page of what's in front of me, but if you look at claim 19 of the 517, it doesn't have anything about an actuator. All it is is programming the first toy to generate a signal, transmit the signal, the second toy to receive it, and then producing a response. I would agree with you, Your Honor, that that would certainly present a closer case compared to, for example, in the same patent claim 23, which requires that you have the toy move or toy move an appendage. So, for example, it could be one of those little cat toys that you see that moves its arm like this. I think that is a much more specific implementation that would present a better case under 101. And, again, this goes back in part to the fact that, despite the fact that we identified a number of claims from each patent, both in the complaint and the opposition, the district court didn't really engage with these differences and tried to look at these patents all as a piece. I would agree with you that the 963 patent presents the strongest case for eligibility here because every claim is expressly limited to a toy kit, where the toys have actuators and perform these physical behaviors. I think some of the other claims in the 517 patent, for example, claim 23, but also claim 16, which talks about a specific implementation using a directional microphone, so it does actually put some meat on the bones of what the non-generic implementation is in the toy that allows it to analyze and respond to these signals. And this is not a case where we have to scour the specification for disclosure about how these things are actually working. You had mentioned the analyzer. The specifications do give quite a bit of detail about how the analyzer detects the position of other toys and detects their direction of motion, for example. The 963 patent, I believe it's at appendix page 65 and 67, talks about different types of microphones, plurality of microphones sensing sound with different frequency coming from different parts of the toy. The patents talk about analyzing signal properties. How are they analyzed? How is the analysis performed? Well, so there is a software component. For example, at appendix page 67, what you see is a description of some of the equations that the microphones would actually use to detect. It can be done in a couple of ways. One way is Doppler shift. And so, for example, when a toy is moving towards you, it will have a different frequency from when it's moving away from you. Right. How is that done? Excuse me, Your Honor? How is that done? How is that done? The microphone is actually sensing the frequency, and then the analyzer is a software or hardware, an integrated circuit perhaps, that interfaces between the microphone and the actuator. Yeah, perhaps. I think that to the extent that there's any issue there, that would be more of a 112 issue to see if the support is there. But certainly compared to other cases this Court has seen where the claims recite just simply producing a response, these claims give quite a bit of detail, the 963 and the 517 particularly, about what those responses need to be and also help guide what the actuator and the analyzer would need to do. If it's going to be a leader-follower functionality, you need to use that directional microphone to detect the sound from another toy and then move towards that toy. And it is relatively simple programming to do that. So I don't think there's a 112 issue there, but that would be the framework for the analysis. Okay. You're into your battles. Thank you, Your Honor. Thank you. Good morning. Good morning. Your Honor, you raised a couple of questions at the outset in terms of the representative claims. From our standpoint, I think the Court should follow what happened at Audit Magnet tracking here. On the opposition to the motion to dismiss, they identified exemplary claims. They didn't use the word representative, but it seemed to have the same effect. So we think those representative or exemplary claims are the claims that the Court can look at here to decide holistically on the patents. You also asked about whether they were preserving a fact question, as it were, and they cited to page 1004 of the appendix, which is in the complaint. But the only thing that's explained there is the observations about how they overcame the prior art. They merely observed that some elements were missing in the prior art. They don't make any effort. There's no allegation that there was something that was not well understood, that was not routine, any of the factors here that are necessary for them to establish. But the burden is on you, not on them. I mean, you have to prove that it's conventional, routine, et cetera. Yes, that's correct, Your Honor, and I don't think there's any doubt. So when looking at that, you, of course, look at the complaint and look at the specifications and the claims as a whole, and then the specific elements. Here, when you look at the specifications in particular, it's very clear that we're dealing with wholly generic equipment. There are literally dozens of sites in the specification. But, for instance, you know— That seems true with respect to toy, because they certainly don't define toy, and with respect to microphone and the like. But what about an actuator? Well, all they say about an actuator is it's something that acts. This is about as generic as you can get. You know, they have an analyzer that analyzes. They have an actuator that has a motor coupled to it to engage in some kind of response. It is—I mean, this Court has said repeatedly that when you're dealing with claim language that is functional in nature— then attached to a conventional motor that can operate the toy. Yes, and the specification, to the extent it talks about it, talks about it in that fashion. It doesn't have to have a processor. An actuator can be purely mechanical. Yes, right. But in some of the claims, it talks about the actuator making the decision on what the response is. So in that respect, it needs a processor. But all these terms that we're using right now are the most generic of terms. And it has the additional problem of being wholly functional in nature. All of these claims talk about responding, sending, receiving. I mean, one of the claims literally uses the words function. The first function is sending. The second function is receiving. And that's always been a telltale sign for this Court that we're talking about something that's directed to an abstract idea. In this case, sending, receiving, and responding to signals. And we did what I think is an interesting exercise with regard to the Claim 19 of the 517. I'm sorry. Yeah, no, I'm just going to ask you something. Yes. So a toy—let's say you're the first person to come up with the idea of a toy that makes noise. You say, oh, I'm going to put a music box inside of a toy, and you pull a string and it makes noise. That's patent eligible, right? Depending on how the claim is phrased, it could or it could not be. Well, I mean, you can make it very simple. You can say a toy that includes a music-making device that operates to make music embedded in the toy if you interact with it in a certain way. I don't necessarily believe that that would be patentable under Alice and her progeny. So you think a toy that makes noise is an abstract idea? Well, you know, that would be a harder Alice case because it would be hard to— Honestly, you're not going to be very helpful to me if you're not even going to start off agreeing that that is eligible. Because to me, if your argument for ineligibility or not is that we're looking at the abstract idea of something of making noise, then that's an over-reductive view of that claim. Let's just assume it's not just the abstract idea of making noise, but there's enough in there to be a physical component. So a toy that makes noise is eligible. Okay. Yes. I agree with all that. Those are fair observations because at that point, step one, it's hard to identify what the actual abstract idea is so you never really get to the— That's the problem with this case. I mean, at least I'm looking mostly at the toy kit, the Clem one in 963, which is the most problematic for me. And it has a lot of stuff in it that looks an awful lot like deer to me. It certainly has some kind of abstract idea within it about toys communicating with each other and responding to signals and the like. But it's two toys operating in a system together. And the abstract idea that may be embedded in this somewhere improves and creates a new toy system, doesn't it? It does because of the abstract idea itself. But isn't that deer? I mean, deer is a rubber-curing system, I think. I haven't read it in a while. That is improved by the application of a natural law. Yeah, I think the interesting contrast is deer and fluke. In deer, it was patent-eligible subject matter because it wasn't just the case of taking the mathematical formula and plugging it into an existing process and then saying, that's it. What they did there was they embedded it more deeply into the process. They explained how to use the formula. They explained the results that came from it and the significance of those results as it differed from what happened before. Why don't they do all that here? They talk about two toys with microphones and receivers and the like. They reference software, an actuator that allows one toy to send a signal, the other toy to respond to that signal in a certain way based upon that response. I know it's not very specific about the kinds of actions and things like that, but I don't think it has to say in detail if you get this response, you'll move your arm, and if you get this response, you'll open your mouth. That seems to me to be stuff a skilled artisan would know how to program. When we're looking at the 963, when we're looking first to see whether it's directed toward an abstract idea and we see what the limitations are, the limitations are all directed toward receiving the signal, analyzing the signal, responding to the signal, having an actuator controlling the response, and then providing a response. From a directed-toward standpoint, it's clear that the entire focus of the patent is on this idea of two devices going back and forth and communicating. Why isn't that patent eligible? If you're the first person to come up with the notion that we have this universe of toys out here that makes noises and even talks and things like that, but nobody's ever thought of putting a receiver in these toys and having them actually talk and respond to each other, why isn't that patent eligible? Isn't that a different type of toy, a toy that merely talks and a toy that actually understands what's being said to it and responds? Not understanding it in any kind of conscious sense, obviously, but they communicate with each other and take specific actions. Why isn't that an eligible new kind of toy? I think we could look at a lot of the Alice Progeny cases and see instances where the abstract idea improved the environment in which it was operating. We could see in automated tracking, RFID being used for tracking objects improved that environment, but still that was not strong enough. In Erie, XML tags improved database searching, but that was not good enough. The reason that they were not good enough was because I think the case law is quite clear. That's because they just improved the operation of a computer rather than created a new type of computer or a new type of database. But why isn't toys that talk to each other a new type of toy rather than just improvement? In Westview, it would be a new type of telephone unit. There are a number of cases where the phones are improved, where you have tangible things that are improved. They tend not to be as stark as toys. They tend to be technical products. But the products themselves are better products because of the addition of the idea. Isn't it actually most of those cases? I don't recognize all the ones you're referencing, but most of the ones I'm familiar with is the computer makes the abstract idea operate more efficiently, not the abstract idea makes the computer a new computer. What about EnFish? There are those cases that talk about... Those are the easiest Alice cases, I think, where you just have an idea and you say, hey, let's do it on a computer. And the court has been very clear that that can't be enough. But those are not the only cases. In automatic tracking, the claims claim an antenna and all kinds of peripheral hardware for the tracking process, which would be improved by the use of RFID. Westview was peripherals that had microphones and speakers almost identical to this case in terms of the overall unit. TLI was a telephone unit. It wasn't just a computer. What about Thales? So Thales follows on Deere. I think you asked the question whether it was Step 1 or Step 2. It was neither, I think, really, as a practical matter, because it was so close to Deere that it just kind of fell on all fours for Deere, for this court. But Thales was... Well, I mean, if you have to put it in a box, it's Step 1, right? I mean, I know Deere is pre-ALICE, but if you look at Deere and the way it's articulated, it's not Step 2. It's a Step 1 case. Yeah, I think it most closely falls into Step 1. I would agree if we have to put it into a box. But that was a very different case than this case, because there you had a unique configuration of sensors. So you had an original problem where you were getting inaccurate data with regard to tracking moving objects relative to other moving platforms. So what the patent... It was a particular configuration, generic components of a particular configuration. Yes, so they took sensors and changed the manner in which they were configured to fundamentally change the entire analysis. So there was a physical change. Sensors were changed in terms of how they were used and result in, rather than doing an analysis of the moving object relative to the Earth, they did a mathematical analysis of the moving object relative to gravitational forces. So there you had a very specific technical problem and a very specific technical solution, which had a both physical and a conceptual nature to it. But the problem is, depending on how you describe these claims, you can come up with the same thing here. You never had toys that could talk to each other before. That's a specific technical problem. They used a specific configuration of conventional items and programmed it in a way to allow them to do something that had never been done before. Why isn't that Thales? Because Thales, the abstract idea was the mathematical formula. And it was just integrated into a much bigger solution. The mathematical formula in Thales also made the process more efficient. It reduced it from three steps to two steps, which in the context of the invention was a big step forward. Right, and it made it more accurate as well. It had many benefits. And that case was really about, I think, the mere fact that you're using a mathematical formula doesn't take an otherwise patentable claim and make it ineligible. The differentiation, I think, to try and get to your point, is when the technical problem is merely the absence of the abstract idea and the technical solution is adding the abstract idea, that kind of solution has not been held up in any case that we've seen. But if you take that logic to its extreme, then it seems to me you're saying, no matter how you write claim one of the 963, if this is the first person that's ever come up with the idea of toys that react to each other, never been done before, the only thing, and that's the main idea to make it an invention, it's never going to be an eligible invention. Depending on time and context, that may be so. Why does time and context matter? Because there could have been challenges associated with that that they overcame. This would be a very different case if for some reason, okay, we're in a toy environment, we're with children, there are challenges associated in some way with the manner of wireless communications in that environment. They identified that challenge and they came up with a solution, a technical solution to that technical problem. That would be eligible. But if it is just, just, hey, I have a good idea, let's use this abstract idea in this different environment, then that is merely a field restriction. My problem is that looking at it from an overview, what the patent does is substitute for the kid. Because whether it's little Billy saying the two toys are talking to each other because he's pretending they're talking to them, that's an abstract idea, but it happens all the time. I know I'm out of time, but if I could just address your point in one more way. We are embarking on the age of the Internet of Things. I can replace some of these claims with toys and put in refrigerator and cell phone, and they would still work. So if we're going to get to a place where... Why isn't that eligible? If you're the first person to come up with a smart refrigerator that can send messages to your phone that says, you need milk, you need eggs, you need orange juice, why isn't that a new invention as opposed to a dumb refrigerator? And I imagine Samsung, which sells that now, has patent applications out there, but the patent applications, if properly framed, are going to be associated with the technological challenges associated with that, not the idea itself. Because if you're going to start doing that with the idea itself, we're going to have cars talking to stop signs. I imagine the technological challenges to that are all implemented using very conventional stuff. They use a conventional refrigerator. They use microprocessors and things to send data signals to your phone. They probably use all kinds of sensors that are preexisting in the refrigerator to detect whether you have milk or orange juice or the like. And the question will be... What they've done is they've ordered them all in a new way to accomplish something that nobody's ever thought of in the first place. I just... I mean, this eligibility stuff, if you start looking at it in that sense, just seems to sweep in a whole lot of innovation. Yeah, I guess my reaction to that is if they face technical challenges in doing that, they're entitled to get a patent on the solution that they came up with. But if it is just going to be... Yes, however they may phrase it. But if it's just going to be, because I'm the first one that came up with the idea that a car could communicate with a stop sign, I could get a patent for that? I mean, preemption is the... Your argument is claim one, the toy system, isn't... I'm just claiming the idea of toys communicating with each other. It has very specific configuration of the various components. I don't know how... I mean, what else would you do to claim one to make this... Assuming that a new toy system is eligible, what else would you add to that claim? Sorry, I know I'm going over time, but what else would you add to that claim to make it eligible? I think the only thing that can make something like claim one eligible is if there is a technological problem and solution. There is no such thing here because the only problem that they've found, it's not a problem, it's just the idea of using an abstract idea in a different environment. Okay, thank you. Thank you. Thank you. I'd like to make one procedural point and one substantive point. My friend on the other side mentioned the description of something as an exemplary claim, and in the context of the 12v6 motion and the fact issues, I just want to point the court to appendix pages 1061 to 62. With 242 claims, Dialware did its best to call out the limitations from all the claims it believed were relevant, and so the bottom of 1061 said Hasbro largely overlooks the differences between the individual patents and claims and focuses improperly at a macroscopic level of abstraction. And then in the footnote on 1062 said we're using exemplary claims, but this is a 12v6 motion. We're trying our best to advance the case for the judge and don't want that to count against us if we wanted to assert more claims. The district judge then did not actually consider any of the claims, even the ones that Dialware did identify, and instead tried to find a core that was underneath all of those claims. On the substantive point, I think that Judge Huger's questions about Deere are what show something interesting about these claims. Some of the 963 claims are, I think, fairly clear on this point. Just like in Deere, and I'll just read the language from Deere. Deere says that the appellant did not want to foreclose the use of the equation, but instead in connection with a series of steps. Those include installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula in a digital computer, and automatically opening the press at the proper time. Is that how you distinguish TLI from Deere in this case, that there are specific steps there, whereas TLI was directed very generally at the idea of coding and classifying data packets, I think. I think that is a good way to distinguish it. This is not a generic computer case. It's a case where the specific steps matter because they're tied to the toys themselves and to the modes of interactive play. Except that, again, some of your claims just don't even come close on that front, right? Like claim 19 that we talked about earlier, on the 517, about over a month sending a signal, receiving a signal, that sounds a lot more like TLI to me. Your Honor, we can accept that that's a closer claim, and again, it goes back to the district court's decision not to look at the patents differently. I would submit that, for example, the 297 patent is really directed to somewhat different subject matter and shouldn't have been considered, you know, part and parcel with the 963 patent. I think that the 963 and some of the claims of the 517 that do recite these specific physical behaviors and some of the 929 patent claims present a much stronger case. And, you know, if the court were to reverse on those, we believe that would be appropriate, but at the very least, given the allegations and the complaint that this improves the toys, we believe that at least on the 12b6 standard, where it's, you know, our opponent's burden to bring clear and convincing evidence to overcome the presumption of validity that we would survive a 12b6 challenge and warrant a vacate and remand. Thank you. Thank you. The case is submitted.